AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Western District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 25-MJ-650 |
| MOISES ORDUNA-RIOS and RAQUEL ORDUNA-RIOS | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____1/27/2020-PRESENT_____ in the county of _____Monroe_____ in the
_____Western_____ District of ___NY, and elsewhere___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 371, 8 USC 1324(a)(1)(A) (ii) and (B)(ii), (a)(1)(A)(i) and (B)(ii), (a)(1)(A)(v)(I), 1324(a)(3), 8 USC 1324a, and 18 USC 1957 and 1956 (h) | Conspiracy, Transporting Unauthorized Aliens for Commercial Advantage or Private Financial Gain,  Harboring Unauthorized Aliens for Commercial Advantage or Private Financial Gain, Conspiracy to Bring in, Harbor, and Transport Unauthorized Aliens, Employment of at Least 10 Unauthorized Aliens within a 12-Month Period, Engaging in a Pattern or Practice of Employing Unauthorized Aliens, and Money Laundering and Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See the attached affidavit of Justen J. Silva, Border Patrol Agent ("BPA"), United States Border Patrol ("USBP"), which
is incorporated herein by reference

☑ Continued on the attached sheet.

_____
Complainant's signature

Justen J. Silva, BPA, USBP
*Printed name and title*

submitted electronically by email in .pdf format. Oath administered, and contents and signature attested to me as true and
accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date: ___November 12, 2025___

_____
*Judge's signature*

City and state: ___Rochester, New York___

Hon. Mark W. Pedersen
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK    )
COUNTY OF MONROE    )        ss:
CITY OF ROCHESTER    )

Justen J. Silva, being duly sworn, deposes and says that:

1.      I am a Border Patrol Agent with the United States Border Patrol in Rochester, New York.  I have been employed with the United States Border Patrol for over five years.

2.      As part of my duties during my employment with the United States Border Patrol, I have investigated violations of the Immigration and Nationality Act and violations of the United States Code, particularly Title 8, United States Code, Section 1324a (Unlawful Employment of Aliens).

3.      The information contained in this affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents, reports, and records gathered through the investigation of this case.

4.      I make this affidavit in support of a criminal complaint charging MOISES ORDUNA-RIOS and RAQUEL ORDUNA-RIOS with violating Title 18, United States Code, Section 371 (Conspiracy), Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (B)(ii) (Transporting Unauthorized Aliens for Commercial Advantage or Private Financial Gain), Title 8, United States Code, Section 1324(a)(1)(A)(i) and (B)(ii) (Harboring Unauthorized Aliens for Commercial Advantage or Private Financial Gain), Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Conspiracy to Bring in, Harbor, and Transport Unauthorized Aliens), Title 8, United States Code, Section 1324(a)(3) (Employment of at

1

Least 10 Unauthorized Aliens within a 12-Month period), Title 8, United States Code, Section 1324a (Engaging in a Pattern or Practice of Employing Unauthorized Aliens), and Title 18, United States Code, Section 1957 and 1956(h) (Money Laundering and Conspiracy to Commit Money Laundering) (hereinafter, collectively the "TARGET OFFENSES").

5.    Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that MOISES ORDUNA-RIOS and RAQUEL ORDUNA-RIOS committed the TARGET OFFENSES.

## **PROBABLE CAUSE**

6.    ORDUNA PLUMBING INC. ("ORDUNA PLUMBING") is a plumbing company based in Michigan.

7.    ORDUNA PLUMBING has operations in various states throughout the country, including but not limited to New York, Michigan, North Carolina, and Ohio.

8.    MOISES ORDUNA-RIOS is the president of ORDUNA PLUMBING.

9.    RAQUEL ORDUNA-RIOS is the Treasurer and Secretary of ORDUNA PLUMBING.

10.    During this investigation, law enforcement discovered that MOISES ORDUNA-RIOS and RAQUEL ORDUNA-RIOS (hereinafter, collectively the "TARGETS"), through ORDUNA PLUMBING, employed approximately 253 individuals,

only six of whom were confirmed through immigration records checks to be legally present and permitted to work in the United States.

11.    While these unauthorized aliens worked for ORDUNA PLUMBING, the TARGETS collected their passports and housed them in overcrowded houses and hotel rooms.

12.    As a result of their employment of unauthorized aliens, between on or about January 1, 2022, and on or about August 7, 2025, the TARGETS generated in excess of approximately $74 million in revenue from customers.

## ARRESTS OF UNAUTHORIZED ALIENS EMPLOYED BY THE TARGETS

13.    On multiple occasions, Border Patrol Agents (BPAs) assigned to the Rochester, New York, and Buffalo, New York, Border Patrol Stations have encountered individuals in vehicles registered to ORDUNA PLUMBING who were illegally present in the United States.

14.    The following United States Border Patrol (USBP) and Immigrations and Customs Enforcement (ICE) arrests have all been of employees of ORDUNA PLUMBING:

15.    On or about January 27, 2020, BPAs from the Buffalo Border Patrol station were conducting surveillance on the Extended Stay America Hotel in Amherst, New York. Due to previous encounters with unauthorized aliens driving vehicles registered in other states, the agents took notice of a van with Michigan license plate DD14499. Record checks indicated that the vehicle was registered to MOISES ORDUNA-RIOS and ORDUNA PLUMBING. Agents observed an individual standing next to the work van and engaged him in a consensual encounter. The individual (hereinafter "Alien 1") said the van belonged to his

3

"boss," and admitted that he was illegally present in the United States. Agents encountered two more coworkers in Alien 1's hotel room who also admitted to being illegally present in the United States (hereinafter "Alien 2" and "Alien 3"). All three individuals were arrested.

16.    On or about February 10, 2020, ICE Agents assigned to Fugitive Operations in Charlotte, North Carolina, were conducting targeted enforcement operations. While looking for their target, ICE Agents observed an individual that matched their target description enter a white van. The van bore Michigan license plate DUP8850 and was registered to MOISES ORDUNA-RIOS. ICE Agents conducted a vehicle stop of the van.

17.    Agents then approached the van, identified themselves as immigration officers, and questioned the five individuals (hereinafter "Alien 4" through "Alien 8") in the van regarding their identities and citizenships. All five individuals were illegally present in the United States and, as a result, were placed under arrest.

18.    On or about April 27, 2023, ICE Agents assigned to Fugitive Operations were conducting surveillance at a particular address in Buffalo, New York. ICE agents observed a white Chevrolet Silverado with Michigan license plate DE16552 leave the residence. The vehicle was registered to ORDUNA PLUMBING. ICE agents believed that the vehicle was occupied by the target of their investigation and conducted a vehicle stop. Agents identified the occupants (hereinafter "Alien 9" and "Alien 10") as citizens and nationals of Mexico who were illegally present in the United States. They were both placed under arrest.

19.    On or about February 21, 2024, BPAs from the Rochester, New York Border Patrol Station responded to a request for help identifying three passengers in a stopped vehicle who were not in possession of any identification. The van bore Michigan license plate

DD92525 and was registered to ORDUNA PLUMBING. Upon arrival, the agents identified the three occupants (hereinafter "Alien 11," "Alien 12," and "Alien 13") and conducted an immigration inspection. All three individuals admitted to being illegally present in the United States without legal documentation to enter or remain. The three individuals were placed under arrest and transported back to the Rochester Border Patrol Station. At the station, the three individuals identified a particular residence in Rochester, New York (hereinafter "GROUP PREMISES 1") as their residence. The individuals claimed that the house was occupied by more coworkers, all of whom were also illegally present in the United States.

20.    Out of the three individuals arrested from this encounter, two of them were criminally prosecuted for violating Title 8, United States Code, Section 1326 (Illegal Reentry by a Previously Removed Alien).

21.    After the February 21, 2024, arrest, Rochester BPAs conducted surveillance on GROUP PREMISES 1 and observed two vehicles with Michigan license plates. All vehicles present at the residence were registered to ORDUNA PLUMBING.

22.    On or about October 28, 2024, Buffalo BPAs encountered a van bearing Michigan license plate DF61187 at the Walmart in Amherst, New York. The vehicle was registered to ORDUNA PLUMBING. Agents noticed three individuals standing near the vehicle and approached.  Agents engaged the three individuals in a consensual encounter. All three individuals (hereinafter "Alien 14," "Alien 15," and "Alien 16") admitted to being illegally present in the United States and were arrested.

23.    On or about December 16, 2024, Rochester BPAs were conducting surveillance on a white GMC Savana van bearing a Michigan license plate DUP8850 and registered to

ORDUNA PLUMBING. Agents located the van at a particular motel in Rochester, New York. At approximately 7:00 A.M., BPAs conducted a vehicle stop of the van. The van was occupied by a driver and two passengers.

24.     The driver of the van (hereinafter "Alien 17") was initially non-compliant with the requests and directions of the agents. Alien 17 used his cellphone to make a phone call which lasted for approximately 5 minutes prior to exiting the vehicle. Alien 17 advised the other two passengers (hereinafter "Alien 18" and "Alien 19") not to comply with agents and not to answer any questions. Through further investigation it was determined that all three individuals were illegally present in the United States. The three individuals were placed under arrest and transported back to the Rochester Border Patrol Station. Alien 17 was criminally prosecuted for violating Title 8, United States Code, Section 1326 (Illegal Reentry by a Previously Removed Alien).

25.     After the arrest on or about December 16, 2024, the white GMC Savana van bearing Michigan license plate DUP8850 was towed.

**CONVERSATION WITH WITNESS 1**

26.     On or about December 20, 2024, an employee of the towing company contacted Rochester BPAs and told them that the secretary of ORDUNA PLUMBING called and asked to have a third-party individual (hereinafter "Witness 1 ") take possession of the towed vehicle.

27.     On or about December 27, 2024, Rochester BPAs went to the tow yard and encountered Witness 1. A Rochester agent, dressed in plain clothes, engaged Witness 1 in conversation about ORDUNA PLUMBING. Witness 1 claimed that there were

approximately 10 ORDUNA PLUMBING employees staying in Rochester, New York. Witness 1 also claimed that ORDUNA PLUMBING had approximately 200 employees across the United States. Witness 1 displayed approximately ten thousand dollars in cash and claimed that he was responsible for paying the ORDUNA PLUMBING employees in the Rochester area.

28.    Witness 1 identified MOISES ORDUNA-RIOS as his boss in the company.

29.    Witness 1, unaware that he was speaking to a BPA, told the agent that if he (the agent) was interested in working for ORDUNA PLUMBING, then MOISES ORDUNA-RIOS would provide him housing, a vehicle, tools, and a small crew. The Agent told Witness 1 that he (the agent) was illegally present in the United States. Witness 1 told the Agent that his immigration status was not an issue, and that MOISES ORDUNA-RIOS would still hire him as an employee.

30.    At the end of this conversation, Witness 1 paid for and retrieved the work van. Rochester BPAs followed Witness 1 to GROUP PREMISES 1, where Witness 1 parked the vehicle alongside other vehicles registered to ORDUNA PLUMBING.

31.    Since this event, Rochester BPAs have observed a total of five vehicles parked at GROUP PREMISES 1. Two vehicles appear to not be in use.

**REVIEW OF ALIEN 17'S CELLPHONE AND WHATSAPP CONVERSATIONS WITH MOISES ORDUNA-RIOS**

32.    Law enforcement subsequently obtained a warrant to search Alien 17's cellphone. In the course of executing that warrant, law enforcement reviewed the phone's call

history and confirmed that, during the vehicle stop on December 16, 2024, Alien 17 called MOISES ORDUNA-RIOS.

33.     According to the WhatsApp data collected from the cellphone, Alien 17 and MOISES ORDUNA-RIOS have a messaging history that begins on or about October 13, 2022, approximately two months before Alien 17 claimed to have illegally entered the country. The conversation, largely through recorded voice messages, revolved around work, work-related questions, and work-related issues.

34.     For example, on or about November 27, 2023, Alien 17 sent MOISES ORDUNA-RIOS a screenshot of what appeared to be an electronic confirmation of payroll. The screenshot showed a deposit of $1,500 from "ORDUNA PLUMBING" and the description is listed as "PAYROLL."

35.     Further, in a WhatsApp conversation on or about October 29, 2024, Alien 17 and MOISES ORDUNA-RIOS engaged in a conversation through mostly voice messages. In the first of the two voice messages, Alien 17 described an incident that happened at a Walmart-likely referring to the October 28, 2024, arrests detailed above-and discussed changing houses in the City of Buffalo, New York. Alien 17 then expressed his opinion that changing addresses would be irrelevant because of their proximity to the Canadian Border. In the second message, it appeared as though Alien 17 was speaking for both himself and his coworkers, and told MOISES ORDUNA-RIOS it was "dangerous" in the Buffalo area. Alien 17 stated that it was dangerous especially in the Buffalo area because they are "indocumentados" or "undocumented." He continued that because they are undocumented, everywhere is dangerous for them, but in Buffalo it is "a little more." He then asked MOISES ORDUNA-RIOS for his opinion on the situation.

36.     In the following voice response, MOISES ORDUNA-RIOS suggested moving the workers to Rochester, New York. MOISES ORDUNA-RIOS said that, although there is also a border in Rochester, it is in the lake, and he surmised that it shouldn't be as much of a problem as Buffalo. Alien 17 replied that things would be difficult for him if he were deported back to Mexico.

37.     MOISES ORDUNA-RIOS responded that he would like the workers to finish the work in the Buffalo Area before moving to Rochester.

38.     Alien 17 responded that he and the other employees wanted extra financial compensation for finishing their work assignment in Buffalo because of the danger.

39.     The WhatsApp conversation history from November 6, 2024, shows Alien 17 received a screenshot from MOISES ORDUNA-RIOS. The screenshot was of an Expedia travel booking confirmation at the particular motel in Rochester, New York, that was previously discussed in Paragraph 24. In the following voice message, MOISES ORDUNA-RIOS apologized for not being able to house Alien 17 in the "company house," and claimed that there were too many people living at the house. MOISES ORDUNA-RIOS also stated that the owners of the home were unhappy that there were more than three individuals living at the residence.

40.     The WhatsApp conversation history also included a conversation with a contact named "Lalo." In this conversation, on or about December 1, 2024, Alien 17 received a location for GROUP PREMISES 1. The address is titled "casa." Location data from the cellphone also reveals its use at GROUP PREMISES 1.

9

**SEARCH OF GROUP PREMISES 1 IN ROCHESTER, NY, WHERE THE TARGETS WERE HARBORING UNAUTHORIZED ALIENS**

41.    On or about February 5, 2025, BPAs executed a federal warrant to GROUP PREMISES 1, pictured below:



42.    GROUP PREMISES 1 is a four-bedroom, three-bathroom, approximately 1,500-square-foot house. Law enforcement discovered nine adult men (hereinafter "Aliens 20-27" and "Subject 1 ") living there.

43.    There was very little furniture except for multiple mattresses on the floor of each bedroom, as pictured below:





44.     All nine individuals who were living in GROUP PREMISES 1 admitted to being illegally present in the United States. The nine individuals were placed under arrest and transported back to the Rochester Border Patrol Station for further record checks and processing.

45.     At the station, it was determined that five individuals were citizens and nationals of Mexico, and four individuals were citizens and nationals of Nicaragua. Record checks revealed that one individual was currently in immigration proceedings subsequent to his illegal entry into the United States. His arrest was documented, and he was released.

46.     In the course of executing the search warrant, BPAs seized cellphones, mail addressed to "Orduna Plumbing Inc.," company credit cards, and employee badges labeled "Orduna Plumbing."

## INTERVIEWS OF UNAUTHORIZED ALIENS
## ARRESTED AT GROUP PREMISES 1

*Alien 20*

47.    On or about February 5, 2025, Rochester BPAs collected post-*Miranda* statements from several of the unauthorized aliens arrested during the search of GROUP PREMISES 1.

48.    Alien 20 told agents that he has been working for ORDUNA PLUMBING since 2018.

49.    Alien 20 stated that he earns approximately $1,500 a week, and his pay is deposited directly into his account by the owner of the company, MOISES ORDUNA- RIOS.

50.    Alien 20 stated he knows GROUP PREMISES 1 has been housing ORDUNA PLUMBING employees since 2020. Alien 20 stated that MOISES ORDUNA-RIOS is responsible for paying the rent and bills for GROUP PREMISES 1.

51.    Alien 20 stated that MOISES ORDUNA-RIOS has a WhatsApp group chat in which some employees are members. Alien 20 stated that MOISES ORDUNA-RIOS uses the group chat to post general information regarding jobs. Alien 20 stated that MOISES ORDUNA-RIOS has also used the WhatsApp group chat to direct unauthorized workers to take certain precautions in order to minimize the possibility of being apprehended by ICE or the U.S. Border Patrol.

*Alien 21*

52.    Alien 21 told the agents that he has been working for ORDUNA PLUMBING for approximately one year.

53.    Alien 21 stated that he earns approximately $800 per week, and he is paid by check that is sent to GROUP PREMISES 1 by FedEx.

54.    Alien 21 stated that MOISES ORDUNA-RIOS is responsible for paying the rent and the bills for GROUP PREMISES 1.

55.    Alien 21 then stated that MOISES ORDUNA-RIOS sends the employee's paychecks to his uncle (hereinafter "Subject 1"), who was also apprehended from GROUP PREMISES 1. Subject 1 then distributed the paychecks to the ORDUNA PLUMBING employees.

*Alien 22*

56.    Alien 22 told Agents that he has been working for ORDUNA PLUMBING for approximately five months.

57.    Alien 22 stated that he earns approximately $1,000 a week, and he receives his payment via check that is sent to GROUP PREMISES 1 by FedEx.

58.    Alien 22 stated that after being hired by ORDUNA PLUMBING, MOISES ORDUNA-RIOS purchased an airplane ticket to transport Alien 22 from Atlanta, Georgia to Rochester, New York. Alien 22 further stated that all the necessary tools and vehicles were provided by MOISES ORDUNA-RIOS.

13

59.     Alien 22 identified MOISES ORDUNA-RIOS as being responsible for paying the rent and bills for GROUP PREMISES 1.

60.     Alien 22 also identified Subject 1 as the uncle of the company owner, MOISES ORDUNA-RIOS.

*Alien 23*

61.     Alien 23 did not specify how long he has been an employee of ORDUNA PLUMBING.

62.     Alien 23 stated that MOISES ORDUNA-RIOS paid for Alien 23's bus ticket to transport him from Florida to New York once he was hired.

63.     Alien 23 stated that he earns approximately $900 a week and receives his payment via check that is sent to GROUP PREMISES 1 by FedEx.

64.     Alien 23 identified MOISES ORDUNA-RIOS as the individual responsible for paying the rent and bills for GROUP PREMISES 1.

65.     Alien 23 identified Subject 1 as the uncle of the company owner, MOISES ORDUNA-RIOS. Alien 23 also stated that Subject 1 was responsible for distributing paychecks to ORDUNA PLUMBING's employees.

## REVIEW OF SUBJECT 1'S CELLPHONE AND WHATSAPP CONVERSATIONS WITH MOISES AND RAQUEL ORDUNA-RIOS

66.     Pursuant to the federal search warrant that authorized the search of GROUP PREMISES 1, Rochester BPAs seized and searched Subject 1's cellphone.

14

67.    During a search of the device, agents found a WhatsApp conversation between Subject 1 and phone number (XXX) XXX-5823.  The WhatsApp contact name under the phone number was listed as "Raquel Orduna." Both RAQUEL ORDUNA-RIOS and MOISES ORDUNA-RIOS were visible in the contact photo.

68.    All of the WhatsApp conversations discussed herein whether quoted or summarized, were translated from Spanish to English.

69.    On or about January 17, 2025, RAQUEL ORDUNA-RIOS sent Subject 1 a message asking him to ask Alien 21, Alien 22, Alien 23, Alien 24, and Alien 25 if they had a TAX ID or a social security number.

70.    Subject 1 responded that they had nothing more than a passport.

71.    RAQUEL ORDUNA-RIOS then asked if everyone has a passport, and Subject 1 confirmed that they did. Subject 1 then claimed that one individual had an expired passport. RAQUEL ORDUNA-RIOS said she could not "use" the passport if it was expired.

72.    She then said that if all the valid passports were not delivered to her within 30 days, she would not be able to pay any of the workers. RAQUEL ORDUNA-RIOS then re-stated that she needed the passports, not including the expired passport, in order to process Tax IDs.[1]

73.    Finally, RAQUEL ORDUNA-RIOS asked Subject 1 for the name of the individual without a passport. Subject 1 identified Alien 24.

---

[1] Unauthorized aliens can obtain tax identification numbers (TINs) to fulfil their income tax obligations. To obtain a TIN, an individual must complete a Form W-7, Application for Individual Taxpayer Identification Number, and include proof of foreign citizenship (typically a passport).

74.     On or about January 24, 2025, RAQUEL ORDUNA-RIOS messaged Subject 1 and advised him that his paycheck was arriving with a larger amount than normal. She said that a particular company (hereinafter "Company 1") gave him a bonus.

75.     Rochester BPAs have identified Company 1 as a construction company based in Syracuse, New York, that was sub-contracting work to ORDUNA PLUMBING.

76.     On or about January 31, 2025, RAQUEL ORDUNA-RIOS asked Subject 1 for an update on sending the passports. Subject 1 asked if he could send more passports than she requested and stated that he was going to send her 14 passports. RAQUEL ORDUNA- RIOS approved and requested that Subject 1 send the passports in a box.

77.     Subject 1's phone also contained a WhatsApp group chat titled "Orduna plumbing inc." The contact photo of the group is the ORDUNA PLUMBING company logo and matches the logo on the company website. The description of the group reads: "General Information, please this group is not to play around! It is the best form of general communication. I do not want it to be used to play around please." The group was created by "Moi" on February 17, 2022. The contact "Moi" had MOISES ORDUNA-RIOS's phone number and picture.

78.     The first message in the group chat was sent by MOISES ORDUNA-RIOS on May 31, 2024. The message was titled "Use of work cars." After greeting the members of the group chat, MOISES ORDUNA-RIOS reminded them to be responsible with the "work vehicles." He told the members of the group to "clean them often," and "secure that everything is functioning well." MOISES ORDUNA-RIOS instructed the members of the group that "if the vehicles need repair, take them to be repaired and to not leave them laying around."

MOISES ORDUNA-RIOS also instructed them to "change the oil every 3,000 miles, not to exceed 5,000." He ordered the group to "not exceed the speed limit," "not drink and drive," and "not abuse the gasoline expense on weekends when it is not being used to work," and suggested that workers contribute money for gas in those circumstances. MOISES ORDUNA-RIOS finished the message by telling the members "to remember there are other places that do not lend vans to their workers." He then surmised that, if a van was being used for non-work purposes, then it was respectful to not use the company card to purchase gas. The members of the group acknowledged the message.

79.    On or about June 26, 2024, MOISES ORDUNA-RIOS sent a reminder to the group that the vehicle registrations were expiring soon. MOISES ORDUNA-RIOS asked the group to send pictures of the license plates and registrations of the vehicles that are expiring "next month." The group members responded by sending photos of the ORDUNA PLUMBING registered vehicles license plates.

80.    On or about August 16, 2024, at approximately 9:20 a.m., MOISES ORDUNA-RIOS sent another message to the group that seemed to be a list of what they were allowed to purchase with the ORDUNA PLUMBING company credit card. MOISES ORDUNA-RIOS began the conversation by stating, "[t]hings that can be purchased with the card please respect it." He added, "[e]veryone has to send the receipts without them being asked." MOISES ORDUNA-RIOS listed 8 general items (list has 9 points but skips number two) and clarified whether each item did or did not need prior approval before being purchased with the company card. He then outlined "[t]hings that cannot be purchased with the card."

81.     MOISES ORDUNA-RIOS then added: "[t]he only people who are going to buy personal tools is when they arrive from Mexico!!!!! A person who does not respect the rules will have their card cancelled and unauthorized expenses deducted from their check.  Its nothing personal with anyone, just imagine someone else using your money on things that arent coming to you. BE CONSCIOUS!!!!."

82.     MOISES ORDUNA-RIOS finished his message to the group by reiterating his previous message about the rules associated with work vehicles. He apologized to the group for "reminding and reminding" because there are always "new people or people who need to be reminded."

83.     Also on or about August 16, 2024, at approximately 9:46 a.m., MOISES ORDUNA-RIOS sent a message titled "HOUSING AND HOTELS." In this message, MOISES ORDUNA-RIOS laid out rules and reminders to the group. He began with "HOUSING" and told the group that they were all responsible for keeping the houses clean, not to mark the walls, and further that they were "responsible for the bills in some homes, NOT IN ALL, depending on the company, ASK." MOISES ORDUNA-RIOS reminded the group to be clean and not dirty the homes. He also laid out rules regarding public behavior.

84.     MOISES ORDUNA-RIOS then sent "HOTELS" rules. He began by stating, "[d]o not leave the van with mud on your shoes, do not leave trash behind when you leave the room, THEY CHARGE ME FOR THAT, do not set off any alarm THEY CHARGE ME IF THEY NOTICE." MOISES ORDUNA-RIOS then again laid out the rules regarding public behavior.

85.     On or about September 7, 2024, MOISES ORDUNA-RIOS sent what appeared to be a copy-and-pasted message that reminded the group of what was allowed to be purchased with the company credit card.

86.     On or about January 29, 2025, MOISES ORDUNA-RIOS sent the group a photo of a vehicle registration sticker and a Michigan vehicle registration (MI DE24736). He followed up with a voice message in which he told the group that any vehicle that has an upcoming registration expiration date in February needed to get it renewed.

87.     MOISES ORDUNA-RIOS stated that he would send the new stickers and registrations to the "address where they are supposed to pick up the checks." The members of the group acknowledged MOISES ORDUNA-RIOS's message and sent pictures of vehicle license plate stickers.

88.     On or about February 1, 2025, at approximately 1:17 p.m., MOISES ORDUNA-RIOS sent the following message to the group:

> Gentlemen, with all the controversy that is going on, its better to get ready, drive the speed limit, limit yourselves going to the store, only do minimal running of errands, and do not have any gatherings such as barbeques. Don't worry about the jobs, I was researching and they cant enter the projects unless they have an order and have notified the construction company. At any time that someone tells me that they are going to arrive I will let them know

89.     MOISES ORDUNA-RIOS continued by saying, "Analysts think this wont last long but for greater security, everyone be really careful."

90.     Based my on training, experience and knowledge of this investigation, it is respectfully submitted that, in the preceding messages, MOISES ORDUNA-RIOS was discussing immigration enforcement activities that had increased in and around February

19

2025 and was advising his workers how to avoid being arrested because he knew they were illegally present in the United States.

91.    At approximately 2:12 p.m., MOISES ORDUNA-RIOS followed up with what appeared to be a copy-and-pasted message from an immigration website. It stated:

> Undocumented Immigrants in the United States have certain IMMIGRATION LAW. Rights, including the right to due process, the right to a lawyer and the right to remain silent. These rights apply to everyone, regardless of their immigration status.

92.    The message then continues to elaborate on those rights.

### IRS FILINGS EVIDENCING THE TARGETS' EMPLOYMENT OF UNAUTHORIZED ALIENS

93.    On or about July 24, 2025, law enforcement obtained an *Ex Parte* Order for Disclosure of Internal Revenue Service Returns and Return Information, signed by United States Magistrate Judge Hon. Mark W. Pedersen.

94.    Pursuant to the *Ex Parte* Order, law enforcement obtained copies of Forms 1099-Nonemployee Compensation (hereinafter "Form(s) 1099-NEC") that were issued by ORDUNA PLUMBING between tax year 2022 and tax year 2024.

95.    Forms 1099-NEC a show a name, Individual Taxpayer Identification Number (ITIN), address, and compensation amount for a certain tax year.

96.    According to the IRS's records, for tax year 2022 through tax year 2024 ORDUNA PLUMBING issued a total of approximately 473 Forms 1099-NEC to approximately 253 workers.

97.    Immigration records showed that, of those 253 workers:

a.    Approximately 112 workers were known to be illegally present in the United States because they were either subject to some form of immigration action or had previously encountered immigration officials;

b.    Approximately 28 workers were either known to be illegally present in the United States because they had overstayed their visas or were lawfully present in the United States but had visas that did not authorize them to work.

98.    Only six of ORDUNA PLUMBING's 253 workers were legally present in the United States and permitted to work because they were either United States citizens, Lawfully Admitted Permanent Residents, or had some sort of lawful immigration status.

99.    Law enforcement searched immigration records to determine whether the remaining 107 workers were lawfully present in the United States and permitted to work here.

100.    Law enforcement found no record of any of the remaining approximately 107 workers in immigration databases.

101.    Based on my training and experience and my knowledge of this investigation, particularly the TARGETS' hiring practices, I respectfully submit that there is probable cause to believe that the most likely explanation for the fact that there were no records for of any of the approximately 107 workers in immigration databases is that most are illegally present in the United States but have not had any interaction with immigration officials and therefore do not have any immigration records.  However, it is also possible that some of these workers are

United States citizens who were born in the United States, never applied for a passport, and never traveled outside of the United States.

## MONEY LAUNDERING

102.    As is set forth above, each payment that ORDUNA PLUMBING received from its customers was the proceeds of a specified unlawful activity ("SUA"), namely violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (B)(ii) (Transporting Unauthorized Aliens for Commercial Advantage or Private Financial Gain), Title 8, United States Code, Section 1324(a)(1)(A)(i) and (B)(ii) (Harboring Unauthorized Aliens for Commercial Advantage or Private Financial Gain), Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Conspiracy to Bring in, Harbor, and Transport Unauthorized Aliens), Title 8, United States Code, Section 1324(a)(3) (Employment of at Least 10 Unauthorized Aliens within a 12-Month Period), and Title 8, United States Code, Section 1324a (Engaging in a Pattern or Practice of Employing Unauthorized Aliens) (hereinafter the "SUA PROCEEDS").

103.    During this investigation, law enforcement obtained records from the following bank accounts at J. P. Morgan Chase Bank (JPMC), Bank of America (BOA), Bank of Ann Arbor (BOAA), and Wells Fargo Bank (WFB):

| Institution | Account Number | Account Title | Signors | Primary Address |
|---|---|---|---|---|
| JPMC | -8257 | Orduna Plumbing Inc. | Moises Orduna-Rios (President) and Raquel Orduna-Rios (Signer) | Michigan Address 2 |
| JPMC | -805 | Raquel Ordonez or Moises Orduna-Rios | Moises Orduna-Rios and Raquel Orduna-Rios | Michigan Address 2 |
| JPMC | -8768 | Moises Orduna-Rios or Raquel Orduna-Rios | Moises Orduna-Rios and Raquel Orduna-Rios | Michigan Address 2 |
| JPMC | -6271 | Raquel Orduna-Rios or Moises Orduna-Rios | Moises Orduna-Rios and Raquel Orduna-Rios | Michigan Address 2 |
| JPMC | -2960 | Orduna Plumbing Inc. | Moises Orduna-Rios (President) and Raquel Orduna-Rios (Signer) | Michigan Address 2 |
| JPMC | -7727 | Raquel Orduna-Rios as Custodian for RC under the MUTMA | Raquel Orduna-Rios | Michigan Address 2 |
| JPMC | -9518 | Orduna Plumbing Inc. | | |
| JPMC | -2484 | Raquel Orduna-Rios | | |
| JPMC | -1100 | Orduna Plumbing Inc. | | |
| BOA | -2210 | Moises Orduna-Rios | Moises Orduna-Rios | N/A |
| BOA | -9032 | Subject 2 | Subject 2 | N/A |
| BOAA | -9275 | Moises Orduna-Rios | Moises Orduna-Rios | Michigan Address 2 |
| BOAA | -6924 | Moises Orduna-Rios | Moises Orduna-Rios | Michigan Address 2 |
| Wells Fargo | -7300 | Orduna Plumbing Inc. | Subject 3 and Moises Orduna-Rios (Signer) | N/A |
| JPMC | -8186 | Raquel Orduna-Rios & Moises Orduna-Rios | | Michigan Address 2 |
| JPMC | -9584 | Raquel Orduna-Rios & Moises Orduna-Rios | | Michigan Address 2 |

104.    IRS agents analyzed the bank accounts listed in the foregoing chart and discovered that the TARGETS used each of these accounts to collect SUA PROCEEDS, use SUA PROCEEDS to pay unauthorized aliens, and/or launder SUA PROCEEDS to themselves.

105.    MOISES ORDUNA-RIOS and RAQUEL ORDONEZ opened JPMC Account -8257 in the name of ORDUNA PLUMBING, on or about June 28, 2018.  The signature card for the account listed MOISES ORDUNA-RIOS as the President and RAQUEL ORDONEZ as a signer.

106.    According to the IRS's analysis, the TARGETS used JPMC Account -8257 as their main business account, where they deposited payments from ORDUNA PLUMBING's customers for work that was performed by unauthorized aliens, *i.e.*, SUA PROCEEDS.

107.    These payments came from customers in New York, North Carolina, South Carolina, Ohio, Michigan, and Tennessee.

108.    Between on or about January 1, 2022, and on or about July 31, 2025, JPMC Account -8257 received check and ACH deposits totaling over $74 Million that were consistent in timing and amount with customer payments.

109.    After these SUA PROCEEDS were deposited in JPMC Account -8257, the TARGETS used the SUA PROCEEDS to make payments to unauthorized aliens.

110.    For example, among the checks that the TARGETS issued out of JPMC Account -8257 were paychecks to the following unauthorized aliens who were previously identified in this affidavit:

> a.    Alien 4, who was arrested on or about February 10, 2020, in Charlotte, NC;
>
> b.    Alien 10, who was arrested on or about April 27, 2023, in Buffalo, NY;

c.      Alien 11, who was arrested on or about February 21, 2024, in Rochester, NY;

d.      Alien 17, who was arrested on or about December 16, 2024, in Rochester, NY; and

e.      Alien 27, who was arrested on or about February 5, 2025, in Rochester, NY.

111.    The TARGETS transferred the remaining SUA PROCEEDS to other bank accounts listed above.  These transactions often involved SUA PROCEEDS in excess of $10,000, in violation of Title 18, United States Code 1957 and 1956(h).

112.    For example, the following chart contains a sample of monetary transactions the TARGETS performed involving SUA PROCEEDS in excess of $10,000:

| Transaction Authorization Date | Account Number | Description | Amount |
|---|---|---|---|
| 2022-12-19 | 8257 | Transfer to CDS XXXXXXXX9518 | $ (500,000.00) |
| 2024-12-29 | 8257 | Online Transfer to CHK …0805 transaction#: 23207165755 | $ (16,000.00) |
| 2024-08-16 | 8257 | Payment to Chase card ending in 9819 | $ (15,000.00) |
| 2024-09-03 | 8257 | Payment to Chase card ending in 9819 | $ (15,000.00) |
| 2024-11-07 | 8257 | Payment to Chase card ending in 9819 | $ (20,198.46) |
| 2024-11-21 | 8257 | Payment to Chase card ending in 9819 | $ (15,000.00) |
| 2024-12-03 | 8257 | Payment to Chase card ending in 9819 | $ (15,000.00) |
| 2024-12-03 | 8257 | Payment to Chase card ending in 9819 | $ (20,000.00) |
| 2024-12-09 | 8257 | Payment to Chase card ending in 9819 | $ (20,000.00) |
| 2024-12-17 | 8257 | Payment to Chase card ending in 9819 | $ (20,000.00) |
| 2024-12-17 | 8257 | Payment to Chase card ending in 3437 | $ (11,997.40) |
| 2024-12-28 | 8257 | Payment to Chase card ending in 9819 | $ (68,000.00) |
| 2023-08-29 | 8257 | ONLINE DOMESTIC WIRE TRANSFER VIA: PINNACLE BANK TN/064008637 A/C: FURRS CLASS CARS LLC CHARLOTTE NC 28227 US REF: PAYMENT 1970 CHEVY C10 IMAD: 0829B1QGC03C009265 TRN: 3348233241ES | $ (51,500.00) |
| 2024-01-22 | 8257 | ONLINE DOMESTIC WIRE TRANSFER VIA: WELLS FARGO NA/121000248 A/C: CLASSIC VENTURE GROUP LLC LUTZ FL 33559 US REF: WIRE FOR 1992 FORD F150/BNF/WIRE FOR 1992 FORD F150/TIME/04:06 IMAD: 0122MMQFMP2M002847 TRN: 3171114022ES | $ (23,319.00) |

## CONCLUSION

113.    Based on the foregoing, I respectfully submit that there is probable cause to believe that MOISES ORDUNA-RIOS and RAQUEL ORDUNA-RIOS committed the TARGET OFFENSES.

_____
Justen J. Silva
Border Patrol Agent
United States Border Patrol

Affidavit submitted electronically by email in .pdf format. Oath administered and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 12th day of November 2025.

_____
HON. MARK W. PEDERSEN
UNITED STATES MAGISTRATE